# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOSE FELICIANO,               :
                                    :    CIVIL ACTION
             Plaintiff,         :
                                      :
      v.                          :
                                      :    NO.  12-4713
THOMAS DOHMAN, et al.        :
                                      :
            Defendants.       :

## MEMORANDUM

BUCKWALTER, S.J.                                   November 17, 2014

Currently pending before the Court is the Motion for Summary Judgment by David DiGuglielmo, former Superintendent of State Correctional Institution at Graterford ("SCIG"); Michael Lorenzo, former Deputy Superintendent; Thomas Dohman, former Security Captain; William Radle, former Security Lieutenant; and Patrick Curran, Property Sergeant (collectively "Defendants"). For the following reasons, Defendants' Motion is granted in its entirety.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Jose M. Feliciano has been an inmate at the State Correctional Institution at Graterford ("Graterford") since 1997.[1] In April 2005, Graterford's Internal Security Department

---

[1] In the course of constructing the factual history of this matter, the Court has reviewed both Plaintiff's and Defendants' statements of facts. While Defendants provide substantial evidentiary support, Plaintiff—despite being given an ample period for discovery and for filing a response to the Motion for Summary Judgment—relies almost exclusively on his Complaint. It is well established that a plaintiff, as the non-moving party, "may not rely merely on allegations or denials in its own pleadings; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Bernard v. Stanfield, No. Civ.A.07-3394, 2009 WL 5205272, at *1 n.1 (D.N.J. Dec. 22, 2009) (citing Fed. R. Civ. P. 56; Maguire v. Hughes Aircraft Corp., 912 F.2d 67, 72 (3d Cir. 1990)). Mindful of the fact that

received several anonymous tips claiming that Feliciano was selling drugs in the prison.  (Defs.'
Mot. Summ. J., Ex. C, Decl. of Thomas Dohman ("Dohman Decl."), ¶ 6, Feb. 4, 2014; Def.'s
Mot. Summ. J., Ex. D, Decl. Of William Radle ("Radle Decl.") ¶ 6, Feb. 12, 2014.)  A search of
his misconduct history showed that he possessed eighteen bags of marijuana in May 2002, and
that he was caught trying to alter a urine sample in June 2002.  (Dohman Decl. ¶ 6; Radle Decl. ¶
6; Def.'s Mot. Summ. J., Ex. J ("Plaintiff's Misconduct History"); Def.'s Mot. Summ. J., Ex. F,
Dep. of Jose Feliciano ("Feliciano Dep."), 70:2–71:18, Oct. 23, 2013.)  Plaintiff also received
misconducts for possession of jewelry and a wristwatch in 2006 and 2007.  (Dohman Decl. ¶ 6;
Radle Decl. ¶ 6; Plaintiff's Misconduct History; Feliciano Dep. 101:15–103:4.)

Defendant Officers Dohman and Radle began an investigation into the anonymous tips by
determining that Plaintiff worked as a janitor in the school building and that Officer Ballard was
the full-time school officer.  (Dohman Decl. ¶ 7; Radle Decl. ¶ 7.)  In April 2005, Dohman and
Radle installed surveillance cameras in the school area and obtained video of two individuals
spending significant time together, touching and kissing.  (Defs.' Mot. Summ. J., Exs. K, L, M.)
The officers believed that it was Plaintiff and Officer Ballard depicted in each instance.
(Dohman Decl. ¶ 8; Radle Decl. ¶ 8.)  Radle and Dohman then confirmed through the Daily
Operations Report, (Defs.' Mot. Summ. J., Ex. N), and the Inmate Work Assignment, (Defs.'
Mot. Summ. J., Ex. O), that Ballard was assigned and present in the school each day that the
images were captured, and that Feliciano was assigned and working in the school for each day of
the video recording.  (Dohman Decl. ¶ 8; Radle Decl. ¶ 8.)

---

Feliciano is a pro se plaintiff, however, the Court will afford him some leniency and consider the
contents of the Complaint as an affidavit.  See Jarrett v. Kovacs, No. Civ.A.94-5824, 1995 WL
121562, at *1 (E.D. Pa. Mar. 20, 1995).

In August 2008, Plaintiff was given a misconduct for possession of a key to a padlocked cabinet in the school area and was removed from the school janitor job.  (Dohman Decl. ¶ 9; Radle Decl. ¶ 9; Def.'s Mot. Summ. J., Ex. U.)  In addition, he was given ninety days in the Restricted Housing Unit.  (Def.'s Mot. Summ. J., Ex. U.)  Dohman and Radle, however, continued to receive reports that he was loitering in the school area and, whenever Plaintiff's presence there was challenged, Officer Ballard would allow him to stay.  (Dohman Decl. ¶ 10; Radle Decl. ¶ 10.)

In November 2008, Plaintiff reported that he was being harassed by Education Guidance Counselor Theresa Snyder.  (Def.'s Mot. Summ. J., Ex. Q, Fact Finding Results.)  Upon interview, Plaintiff stated that, in January 2008, Ms. Snyder asked him to move some furniture in her office, in connection with his duties as a school janitor  (Id.)  When he bent down to pick up some heavy boxes of books, Miss Snyder bent down at the same time, facing away from Plaintiff, and their backsides touched.  (Id.)  He indicated that this was the extent of the physical contact, but he believed it to be intentional and slow.  (Id.)  When asked why he did not report it until almost a year later, he stated that he was afraid of reprisal and the stigma of reporting.  (Id.)  Notably, Plaintiff had previously filed a grievance against Miss Snyder on January 9, 2008, saying he was being harassed by her because (1) when he refused to clean her office on Friday afternoons because of limitations on his permission to enter rooms during the week, she became angry with him and (2) she requested that he clean up a dead roach on her office floor.  (Def.'s Mot. Summ. J., Ex. R.)

Miss Snyder, on the other hand, explained that she became familiar with Plaintiff when she was re-assigned to the School Building as a Corrections Academic Guidance Counselor and

3

she issued Plaintiff a misconduct, on January 11, 2008, for puposely sweeping dirt on her foot. (Fact Finding Results; Def.'s Mot. Summ. J., Ex. S.)  She indicated that Plaintiff volunteered to clean her office when she moved in and that, on another occasion, she asked him to pick up a dead roach on her floor.  (Id.)  She denied ever touching him or making any inappropriate comments.  (Id.)  On January 20, 2009, Radle submitted to Superintendent Lorenzo his sexual harassment investigation findings, wherein he determined that Plaintiff's sexual harassment claims against Snyder were unfounded.  (Def.'s Mot. Summ. J., Ex. Q.)

On December 31, 2008, Officers Dohman and Radle confronted Plaintiff about his relationship with Officer Ballard and its connection to drug distribution in Graterford.  (Defs.' Mot. Summ. J., Ex. B, Decl. of Michael Lorenzo ("Lorenzo Dep."), ¶ 7, Feb. 4, 2014.)  In the course of doing so, they used a tactic called "cultivating informants" in which they asked him if he would like to cooperate with them for more lenient treatment.  (Id. ¶ 8.)  According to Plaintiff, on December 31, 2008, Plaintiff attended his afternoon call out for the law library. (Compl. ¶ 1.)  While awaiting the opening of the law library, Plaintiff was approached by two security officers, patted down, handcuffed, and escorted to the Security Department.  (Id. ¶ 2.) Once at the Security Department, he was taken into the Security Captain's office, where Officers Dohman and Radle were waiting for him.  (Id. ¶ 3.)  Captain Dohman asked Plaintiff to "tell him about the stuff," to which Plaintiff responded that he did not know what he was talking about. (Id. ¶ 4.)  Captain Dohman then began screaming at Plaintiff stating, "I know she's bringing you that sh[**]!  Just tell me she's bringing it in!"  (Id.)  When Plaintiff again asked Dohman what he was talking about, Dohman said, "look, just tell me she is bringing you drugs and we will let you stay in this institution (Graterford) and you could go back to your housing unit. . . .  If you don't

cooperate, then I'm sending you far away. . . .  Tell me Officer Ballard is bringing you drugs, that

is all I want you to say."  (Id. ¶ 5.)  At that point, Lieutenant Radle joined in and stated, "You will

be far away from you family, José.  We know they come to visit you, and if you don't tell us

what we want you to say, you will never hug your kids again or see your family in a very long

time."  (Id. ¶ 6.)  Plaintiff then told both officers that, "I can't tell you about something that isn't

true. . . .  What you want me to say is a lie and I will not lie about or on Mrs. Ballard."  (Id. ¶ 7.)

Dohman, however, remarked that he knew Plaintiff was having a relationship with Ballard and

commented, "What, you think I just fell off a turnip truck."  (Id. ¶ 8.)  When Plaintiff again

refused to cooperate, Dohman indicated that he had Plaintiff on tape and began to remove video

cassette tapes from a shelf above his desk.  (Id. ¶ 9.)  Plaintiff stated his belief that this was being

done because he filed a complaint against Mrs. Snyder, and Lieutenant Radle responded, "[t]hen

just do what we are asking of you and you could stay here at Graterford.  You could work for us

and not have to worry about getting transferred."  (Id. ¶ 10.)  Upon his further refusal to

cooperate, Plaintiff was handcuffed again and escorted to the Restricted Housing Unit ("RHU")

where he received a DC-141, Part 1 "Other Report," placing him on Administrative Custody

("AC") status.  (Id. ¶ 11.)

　　　In January 2009, Officers Radle and Dohman submitted an investigation report regarding

Plaintiff's and Officer Ballard's suspected fraternization.  (Defs.' Mot. Summ. J., Ex. P.)

Dohman and Radle also requested that Ballard be brought up on administrative charges for

fraternization with an inmate, but their request was denied because the decision-makers felt that

the officers lacked sufficient evidence.  (Dohman Decl. ¶ 12; Radle Decl. ¶ 12.)

　　　Plaintiff received his first Program Review Committee ("PRC") hearing on February 6,

2009, at which time he was continued on AC status, under investigation, and pending transfer. (Compl. ¶ 12.)  While being housed in AC, Plaintiff requested some of his legal property and, on February 19, 2009, was permitted to select a box of property to take back to his cell.  (Def.'s Mot. Summ. J., Ex. W.)  Plaintiff appealed the decision rendered by the PRC, which was referred back to the Committee for another hearing.  (Compl. ¶ 13.).  The second PRC hearing was held on March 4, 2009, at which time Deputy Murray, Defendant Deputy Lorenzo, and Mr. Alinski were present.  (Id. ¶ 14.)  During that hearing, Plaintiff claimed that the actions were being taken against him because he refused to lie about Officer Ballard, and he denied all allegations that he ever had a relationship with Officer Ballard or that she brought him drugs/contraband.  (Id. ¶15.)  Nonetheless, Plaintiff was continued on AC status and informed that he would be transferred per the request of Captain Dohman.  (Id. ¶ 16.)

Again in March 2009, Plaintiff was escorted to the Security Department from the RHA, where Lieutenant Radle asked Plaintiff to "cooperate" with him and commented that, "If you just say that Officer Ballard brought you in some drugs, I could make this all go away and I will help stop your transfer."  (Id. ¶ 17.)  Plaintiff repeated, however, that he had no knowledge of any drugs or contraband being brought into the institution by Ballard or anyone else and would not cooperate in lying.  (Id.)

On March 5, 2009, Plaintiff's Unit Manager filed a transfer petition and Plaintiff was sent to SCI Greene on April 28, 2009.  (Dohman Decl. ¶ 11; Radle Decl. ¶ 11; Def.'s Mot. Summ. J., Ex. Y; Def.'s Mot. Summ. J., Ex. Z.)  On March 9, 2009, Plaintiff wrote to Superintendent David DiGuglielmo, appealing the decision of the PRC Committee, denying the allegations made by Captain Dohman, and expressing that the actions taken by Dohman were a result of Plaintiff's

refusal to cooperate with fabricating a story against Officer Ballard.  (Compl. ¶ 18.)  This appeal was answered by Deputy Lorenzo, who stated that it "was within Dohman's parameters of his position to try and 'cultivate' informants."  (Id. ¶ 19.)  As such, on April 3, 2009, Plaintiff submitted a grievance to the section officer, to be placed in the out-going mail bag.  (Id. ¶ 20.)  This grievance challenged the reasons for Plaintiff's placement on AC status and the retaliatory actions taken by Captain Dohman and Lieutenant Radle.  (Id.)  During his placement in the RHU, however, Plaintiff received a notice from the State Superior Court in which his appeal was denied and which informed him of his time for seeking allowance of appeal with the Pennsylvania Supreme Court.  (Id. ¶ 21.)

After submitting several request slips to prison officials pleading to have access to his legal property, Plaintiff filed a grievance, dated April 2, 2009, by handing said grievance to another inmate so that the inmate could send Plaintiff's grievance to the grievance coordinator. (Id. ¶ 22.)  On April 8, 2009, Plaintiff was finally escorted to the property room, where he was only allowed to go through several personal property boxes, but was not allowed to organize his legal materials to locate the documents necessary to perfect his allowance.  (Id. ¶ 23; Def.'s Mot. Summ. J., Ex. X.)  In addition, it was obvious that his property had been searched.  (Compl. ¶ 23.)  Plaintiff's April grievance then received an answer dated April 2, 2009, suggesting it had never been reviewed by the assigned grievance coordinator, Wendy Shaylor, since Plaintiff had submitted it on that same date.  (Id. ¶ 24.)  Accordingly, Plaintiff immediately appealed.  (Id.) On April 13, 2009, Plaintiff sent a letter to Ms. Shaylor inquiring about his grievance challenging his AC placement.  (Id. ¶ 25.)  When Plaintiff received no confirmation from Ms. Shaylor, he submitted a second letter to her on April 27, 2009, again challenging his AC confinement,

inquiring about the status of his grievance, and asking if his two previous letters were received. (Id. ¶ 26.)

During the pendency of his appeal challenging his denial of access to the courts, Plaintiff was transferred to S.C.I. Greene.  (Id. ¶ 27.)  He was continued on AC status because of his falsified records and was denied access to his legal and personal property.  (Id. ¶ 28.)  On June 12, 2009, after not receiving an answer from Superintendent DiGuglielmo, Plaintiff submitted his second letter inquiring into the status of his appeal challenging the denial of access to the courts. (Id. ¶ 29.)  Subsequently, on July 15, 2009, Plaintiff sent another letter, but this time submitted it to Dorina Varner, Chief Grievance Coordinator, requesting confirmation as to whether his grievance challenging his AC confinement and retaliation claim was received by said office.  (Id. ¶ 30.)  Shortly thereafter, Plaintiff received a response from Defendant DiGuglielmo, pertaining to his first grievance challenging his denial of access to his legal property and access to the courts.  (Id. ¶ 31.)  On July 22, 2009, Plaintiff then filed his appeal for Final Review, challenging denial of access to his legal property and denial of access to the courts.  (Id. ¶ 32.)

Plaintiff was released to the general population at S.C.I. Greene on August 6, 2009, yet his legal and personal property continued to be withheld.  (Id. ¶ 33.)  On August 12, 2009, Plaintiff received a response from Dorina Varner in a Notice of "Action Required," stating that Plaintiff's appeal had exceeded the two-page limit.  (Id. ¶ 34.)  Therefore, Plaintiff submitted his revised version of the appeal on August 20, 2009 to the Secretary's Office of Inmate Grievance and Appeals.  (Id. ¶ 35.)  He then sent a letter to the same office, on October 5, 2009, inquiring as to the status of that revised version.  (Id. ¶ 36.)  Having received no response as of November 11, 2010, Plaintiff submitted another letter to Ms. Varner regarding the status of his grievance.  (Id. ¶

37.)  He followed up with letters to Ms. Varner on March 10, 2011; Jeffrey Beards, the Secretary

of Corrections on June 20, 2011; and to Ms. Varner again on October 5, 2011.  (Id. ¶¶ 38–40.)

Finally, on November 1, 2011, Plaintiff received a response from Ms. Varner's office in which

Plaintiff was informed that her office never received Plaintiff's grievance or prior

correspondence.  (Id. ¶ 41.)

On August 29, 2012, Plaintiff initiated the instant action under 42 U.S.C. § 1983, alleging

violations of his First, Fifth, Eighth, and Fourteenth Amendment rights under the United States

Constitution.  Plaintiff also claimed that all Defendants are personally involved and are liable in

both their individual and official capacities.  (Id. ¶¶ 50–57.)  By way of a Memorandum Opinion

issued March 25, 2013, the Court dismissed all § 1983 claims against the Commonwealth

Defendants in their official capacities and found that Plaintiff's access to courts claim failed due

to Plaintiff's inability to plead actual injury.  Nonetheless, the Court retained Plaintiff's claim

under the First and Fourteenth Amendments alleging retaliation for filing a sexual harassment

complaint against Ms. Snyder, his claim under the Fifth and Fourteenth Amendments alleging

retaliation for his refusal to cooperate in an internal security investigation, and his claim under

the Eighth Amendment.  Feliciano v. Dohman, No. Civ.A.12-4713, 2013 WL 1234225 (E.D. Pa.

March 25, 2013).

On February 19, 2014, Defendants filed the current Motion for Summary Judgment as to

Plaintiff's remaining claims.  Following an extension of time from the Court, Plaintiff filed his

Response on August 11, 2014, and supplemented that Response on August 15, 2014.  The

Motion is now ripe for judicial consideration.

9

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325.  If the non-moving party "fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at 322.  Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue.  Anderson, 477 U.S. at 249–50.

## III.    DISCUSSION

Defendants now seek summary judgment in their favor on all of Plaintiff's remaining claims.  In support of their Motion, Defendants raise numerous arguments.  The Court addresses the most pertinent of these arguments.

### A.    <u>Statute of Limitations</u>

Defendants initially argue that all of Plaintiff's claims are barred by the applicable statute of limitations.  Actions brought pursuant to 42 U.S.C. § 1983 are subject to the statute of limitations applicable to personal injury claims in the state in which the claim arises, without regard for the facts upon which the claim is based or the nature of the injury sustained.  Owens v. Okure, 488 U.S. 235, 249–250 (1989).  The statute of limitations for personal injury actions in Pennsylvania—where the present cause of action arose—is two years.  See 42 Pa. Cons. Stat. § 5524; see also Ormsby v. Luzerne Cnty. Dept. of Public Welfare Office of Human Servs., 149 F. App'x 60, 62 (3d Cir. 2005).  "A cause of action accrues when the plaintiff knows or has reason to know of the injury that constitutes the basis of the cause of action."  Id.

Notably, however, in the context of a § 1983 suit brought by a prisoner, the Prison Litigation Reform Act ("PLRA") requires prisoners to present their claims through an administrative grievance process before seeking redress in federal court.  42 U.S.C. § 1997e(a).

11

A prisoner must comply with the PLRA exhaustion requirement with respect to any claim arising in a prison setting, regardless of the nature of the claim or the relief sought.  Porter v. Nussle, 534 U.S. 516, 532 (2002); Ballard v. Williams, No. Civ.A.10-1456, 2010 WL 7809047, at *5 (M.D. Dec. 9, 2010).  Although the United States Court of Appeals for the Third Circuit has not definitively spoken on this issue, it has recognized that "several courts of appeals have concluded that, because exhaustion is mandatory under the PLRA, the statute of limitations applicable to § 1983 actions must be tolled while a prisoner exhausts." Shakuur v. Costello, 230 F. App'x 199, 201 (3d Cir. 2007) (citing Brown v. Valoff, 422 F.3d 926, 942–43 (9th Cir. 2005); Johnson v. Rivera, 272 F.3d 519, 522 (7th Cir. 2001); Brown v. Morgan, 209 F.3d 595, 596 (6th Cir. 2000); Harris v. Hegmann, 198 F.3d 153, 158 (5th Cir. 1999)); see also Adderly v. Ferrier, 419 F. App'x 135, 137 (3d Cir. 2011).  Similarly, a number of district courts within the Third Circuit have concluded that the statute of limitations applicable to § 1983 is tolled while an inmate exhausts his or her administrative remedies under the PLRA.  Miscovitch v. Judge, No. Civ.A.09-2699, 2012 WL 1521071, at *2 (E.D. Pa. April 30, 2012); Beckett v. Dept. of Corr., No. Civ.A.10-0050, 2010 WL 5092973, at *3–4 (M.D. Pa. Dec. 8, 2010); Ballard, 2010 WL 7809047, at *5 ; Ozoroski v. Maue, No. Civ.A.08-0082, 2009 WL 414272, at *7 (M.D. Pa. Feb. 18, 2009); Carter v. Pa. Dep't of Corr., No. Civ.A.08-279, 2008 WL 5250433, at *11 (E.D. Pa. Dec. 17, 2008); Cooper v. Beard, No. Civ.A.06-171, 2006 WL 3208783, at *8 (E.D. Pa. Nov. 2, 2006).  "These cases all recognize a fundamental truth: Having mandated administrative exhaustion of inmate grievances as a prerequisite to bringing an action in federal court, principles of equity now require us to toll the statute of limitations while inmates complete this mandatory exhaustion process." Ballard, 2010 WL 7809047, at *5.

12

Defendants argue that, per Plaintiff's own concession, both of his retaliation claims arose on December 31, 2008, when Officers Dohman and Radle placed him in Administrative Custody and began the inmate transfer procedure.  (Feliciano Dep. 14:3–19:17; 32:24–12; 37:11–40:11.) He was ultimately transferred to SCI Greene on April 28, 2009 (Def.'s Mot. Summ. J., Ex. Z), but was not released to the general population at S.C.I. Greene until August 6, 2009.  (Compl. ¶ 33.)  Defendants also aver that Plaintiff's Eighth Amendment claim arose at the time he was in AC because, according to Plaintiff's deposition testimony, this claim is based on the fact that "[t]hey [the supervisors] were all aware of what was going on and did not act on it."  (Feliciano Dep. 95:22–96:6.)  Given this evidence, Defendants allege that Plaintiff knew or had reason to know of all of his claims no later than April 28, 2009, yet he did not commence this action until August 29, 2012, over three and a half years later, thereby making the action untimely.

Plaintiff now alleges that the statute of limitations should be tolled during the period that he was exhausting his administrative remedies with respect to his claims.  In the Memorandum and Order of March 25, 2013, the Court previously determined that untimeliness was not clear on the face of the Complaint, as it appeared that Plaintiff was exhausting remedies from late 2011 into early 2012.  Feliciano, 2013 WL 1234225, at *6.  In their Motion for Summary Judgment, however, Defendants contend that Plaintiff did not sufficiently toll the statute of limitations for his First and Fifth Amendment retaliation claims or his Eighth Amendment claim.  Having reviewed the evidence of record, this Court agrees.

### 1. Fourteenth Amendment Retaliation and Eighth Amendment Claims

First, with respect to Plaintiff's claim of retaliation under the Fourteenth Amendment and his claim under the Eighth Amendment, the Court finds that the statute of limitations was

never tolled. Although Plaintiff filed three separate grievances while in administrative custody, he never filed a grievance related to his commitment to AC pending transfer. Had he filed a grievance to that effect, the grievance would have tolled the statute of limitations during the period of time it took to exhaust that grievance or for time to run out to appeal. The grievances on record, however, consist of (1) a February 18, 2009 grievance complaining about the lack of a shower, razor, and mirror since being housed in AC; (2) a March 6, 2009 grievance complaining of not receiving AC commissary; and (3) an April 2, 2009 grievance complaining that, since being placed in AC, he has not been able to receive most of his legal material from his property. (Def.'s Mot. Summ. J., Ex. AA, Decl. of Wendy Shaylor, Exs. 1–3, Sept. 30, 2013.) Wendy Shaylor, the Grievance Coordinator at Graterford, avers that these are the only three grievances of which she has record and that she has no record of any grievance filed by Plaintiff challenging his commitment to AC either while in AC or after his transfer to SCI Greene. (Shaylor Decl. ¶¶ 7–17.) Because such grievances were unrelated to his present claim for retaliation due to either placement in AC or transfer, they cannot act to toll the statute of limitations on the filing of such claims.

Plaintiff responds, however, that he did, in fact, submit a grievance challenging his AC placement. He explains that he was placed in two different housing units when he moved to the RHU. He was first placed on L-Block, but then subsequently moved to J-Block, which was a far less preferred housing unit due to its poor conditions. (Pl.'s Resp. Opp'n Mot. Summ. J. 16.)[2] Once Plaintiff was on J-Block in April of 2009, he submitted his grievances challenging his AC placement and denial of legal property on April 3, 2009. (Id.) According to Plaintiff, J-Block

---

[2] Plaintiff did not number the pages of his brief, so the Court has done so for him.

14

officers would sort through prisoner mail.  (Id. at 17.)  As a result, he believes that his grievance

challenging his AC placement never made it to its intended destination.  Therefore, he asserts

that he should be entitled to tolling during the ongoing pendency of that grievance regardless of

whether the grievance ever made it to the proper officials.

Plaintiffs' argument, however, fails on several levels.  First, aside from a generalized

allegation in the Complaint that, on April 3, 2009, Plaintiff submitted a grievance challenging his

placement on AC status and the retaliatory actions by Dohman and Radle, (Compl. ¶ 20), the

record is devoid of any evidence regarding the existence of this grievance.  Although Plaintiff has

managed to produce evidence of his multiple other grievances, he has not produced a single copy

of this alleged grievance challenging his AC status.  Moreover, Ms. Shaylor, the Grievance

Coordinator, has explicitly averred that she has no record of any grievance filed by Plaintiff

challenging his commitment to administrative custody, either while he was in the RHU or after

his transfer to SCI Greene.  (Shaylor Decl. ¶ 17.)  While the Court recognizes that Plaintiff is a

pro se litigant, he remains subject to the rule that conclusory and self-serving statements are

insufficient to withstand a motion for summary judgment, particularly when Plaintiff has proven

himself so adept at navigating the legal process.  See Irving v. Chester Water Auth., 439 F.

App'x 125, 127 (3d Cir. 2011).

Moreover, even assuming Plaintiff actually filed such a grievance, Plaintiff has failed to

establish that he pursued this grievance any further in order to satisfy exhaustion.  In his

Complaint, he asserts that, on April 13, 2009, he sent a letter to Ms. Shaylor inquiring about his

grievance challenging his AC placement.  (Compl. ¶ 25.)  When he received no confirmation

from Ms. Shaylor, he submitted a second letter to her on April 27, 2009, again challenging his

AC confinement, inquiring about the status of his grievance, and asking if his two previous letters were received.  (Id. ¶ 26.)  Again, however, Plaintiff provides no copies of this correspondence and Ms. Shaylor avers that, despite her search of the 2009 archives—where copies of all inmate requests to staff are retained—she could not find these requests.  (Shaylor Decl. ¶ 19.)  The last potential letter Plaintiff sent with respect to this purported grievance was one to Dorina Varner on July 15, 2009.  (Compl. ¶ 30.)  Plaintiff does not allege any other follow-up.

Finally, even giving Plaintiff the benefit of the doubt and assuming that he filed such a grievance challenging his AC commitment and followed up with the letters to Ms. Shaylor on April 13 and April 27, 2009, and Ms. Varner on July 15, 2009, Plaintiff still has not proven any entitlement to the extensive tolling he seeks.  At his deposition, Plaintiff testified that when he filed his grievance, he had a feeling it "wasn't going to make it" to the proper destination. (Feliciano Dep. 14:6– 16:8.)  Moreover, despite being able to successfully file and exhaust multiple other grievances, Plaintiff admitted that he never otherwise followed up on his grievance challenging his AC commitment or filed a new grievance on the same issue.  (Id. at 16:24–19:17.)  Allowing Plaintiff to rely on a failed filing—whether it resulted from his or Defendants' missteps—to permanently toll the statute of limitations on initiating a civil action would create an unreasonable outcome.  Such a ruling would allow prisoners—especially those who, like Plaintiff, are clearly well-versed in the prison administrative procedures—to eternally delay filing civil actions under a claim that they were awaiting the result of non-existent grievance.  As such, even assuming Plaintiff submitted a follow-up inquiry on July 15, 2009, the fact that he received no response and otherwise did not pursue the grievance any further should

16

have alerted him that he could file a federal lawsuit by no later than the end of 2009.  Yet, he did

not seek judicial intervention until August 2012, well past the expiration of the statute of

limitations.  Accordingly, Plaintiff's Fifth Amendment retaliation and Eighth Amendment claims

must be dismissed.

## 2.    First Amendment Retaliation

With respect to Plaintiff's First Amendment retaliation claim, Defendants concede that

Plaintiff did, in fact, grieve his denial of access to courts.  Specifically, he placed his first request

for legal materials while he was in AC, on February 10, 2009.  (Def.'s Mot. Summ. J., Ex. V.)

He filed his original grievance on that issue on April 2, 2009.  (Shaylor Decl., E. 4.)  In response,

Plaintiff was taken to the Property Room on April 8, 2009 to retrieve his legal materials and the

grievance was deemed resolved.  (Id.)  Dissatisfied with this outcome, Plaintiff appealed the

decision to Superintendent Diguglielmo on April 19, 2009.  (Id.)  The Superintendent upheld the

previous decision by letter dated May 27, 2009.  (Id.)  Plaintiff then appealed the grievance to a

final appeal level, but it was rejected on August 12, 2009 because his appeal exceeded the page

limit.  (Id.)  He then re-filed for final review and the Final Appeal Decision, received at

Graterford on October 9, 2009, upheld the denial of both his grievance and his request for

compensatory and punitive damages.  (Id.)  Upon doing so, Plaintiff had fully exhausted his

grievance.  (Shaylor Decl. ¶ 16.)  Accordingly, the statute of limitations commenced running no

later than the end of October 2009.[3]  Plaintiff, however, did not initiate suit until August 2012,

---

[3] Although Plaintiff claims to have written several additional letters at the end of 2010 into the beginning of 2011, it is unclear what the substance of those letters was.  (Compl. ¶¶ 37–40.)  To the extent Plaintiff claims he was attempting to discern the outcome of his final appeal, having never received the decision mailed in October 2009, this argument does not support any additional tolling.  Assuming Plaintiff did not receive the final decision, Plaintiff

thereby causing this claim to be time-barred as well.

**B.    Plaintiff's Failure to Establish Substantive Elements of His Claims**

Even assuming *arguendo* that Plaintiff's claims were not time barred, summary judgment is warranted due to his failure to establish all of the *prima facie* elements of these claims.  The Court considers the First Amendment retaliation, Fifth Amendment retaliation, and Eighth Amendment claims separately.

**1.    First Amendment Retaliation**

Retaliation for the exercise of a constitutionally protected right may violate the protections of the First Amendment, which is actionable under Section 1983.  Rauser v. Horn, 241 F.3d 330, 224 (3d Cir. 2001).  Merely alleging retaliation, however, is insufficient.  Rather, in the Third Circuit, "[a] prisoner alleging that prison officials have retaliated against him for exercising his constitutional rights must prove that: (1) the conduct in which he was engaged was constitutionally protected; (2) he suffered 'adverse action' at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to discipline him."  Carter v. McGrady, 292 F.3d 152, 158 (3d Cir. 2002) (citing Rauser, 241 F.3d at 333); see also Allah v. Al-Hafeez, 208 F. Supp. 2d 520, 534–35 (E.D. Pa. 2002).

Under the first factor, it is well settled that government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for the exercise of a constitutional right.  Allah v. Seiverling, 229 F.3d 220, 224–25 (3d Cir. 2000).  Thus, a prisoner litigating a retaliation claim

_____

submitted his revised final appeal in August 2009, yet chose not inquire as to its status until November 2010, over a year later.

need not prove that he had an independent liberty interest in the privileges he was denied. Rauser, 241 F.3d at 333.  Rather, the plaintiff must simply show that the conduct which led to the alleged retaliation was constitutionally protected.  Id.

Second, the prisoner must demonstrate that he suffered some "adverse action" at the hands of the prison officials.  An "adverse" action is one that is "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights."  See Allah, 229 F.3d at 225 (internal quotations omitted).  Examples of actions sufficiently adverse to support a retaliation claim include filing false misconduct reports, Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003), transferring a prisoner to another prison, Rauser, 241 F.3d at 333, and placing a prisoner in administrative custody.  Allah, 229 F.3d at 225.

Third, the prisoner must establish a causal link between the exercise of the constitutional right and the adverse action taken against the prisoner.  Rauser, 241 F.3d at 333–34.  To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. See Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503–04 (3d Cir. 1997); Woodson v. Scott Paper Co., 109 F.3d 913, 920–21 (3d Cir. 1997).  The temporal proximity of a retaliatory act to a plaintiff's exercise of his or her First Amendment rights is probative, but not dispositive, of the causation element.  Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir. 2003); see also Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997) (stating that "temporal proximity merely provides an evidentiary basis from which an inference can be drawn").  For temporal proximity alone to establish causation, the "timing of the alleged retaliatory action must be 'unusually suggestive' of

retaliatory motive before a causal link will be inferred." Marasco, 318 F.3d at 512 (quoting

Krouse, 126 F.3d at 503). The Third Circuit Court of Appeals has suggested that a temporal

proximity of two days is sufficient to establish causation, see Farrell v. Planters Lifesavers Co.,

206 F.3d 271, 279–80 & n.5 (3d Cir. 2000), whereas a temporal proximity of ten days is

sufficient to establish causation only when accompanied by other evidence of wrongdoing.

Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 (3d Cir. 2003). "This suggests that

the temporal proximity must be measured in days, rather than in weeks or months, to suggest

causation without corroborative evidence." Conklin v. Warrington Twp., No. Civ.A.06–2245,

2009 WL 1227950, at *3 (M.D. Pa. April 30, 2009). "Applying this standard, courts in civil

rights cases have frequently rebuffed speculative efforts to infer causation from temporal

proximity when a span of weeks, months or years separated the plaintiff's constitutionally

protected conduct from the defendants' alleged acts of retaliation." Victor v. Huber, No.

Civ.A.12–282, 2012 WL 2564892, at *9 (M.D. Pa. Feb. 28, 2012). In the absence of that proof,

the plaintiff must show that, from the "evidence gleaned from the record as a whole," the trier of

the fact should infer causation. Farrell, 206 F.3d at 281.

    Notably, when examining these causation issues, the Third Circuit has specifically

admonished that:

> A court must be diligent in enforcing these causation requirements because otherwise
> a public actor cognizant of the possibility that litigation might be filed against him,
> particularly in his individual capacity, could be chilled from taking action that he
> deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff
> by engaging in protected activity might be able to insulate himself from actions
> adverse to him that a public actor should take. The point we make is not theoretical
> as we do not doubt that public actors are well aware that persons disappointed with
> official decisions and actions frequently bring litigation against the actors responsible
> for the decisions or actions in their individual capacities, and the actors surely would

want to avoid such unpleasant events.  Thus, it would be natural for a public actor to attempt to head off a putative plaintiff with the unwarranted expenditure of public funds.  Courts by their decisions should not encourage such activity and, by enforcing the requirement that a plaintiff show causation in a retaliation case, can avoid doing so as they will protect the public actor from unjustified litigation for his appropriate conduct.  In this regard we recognize that often public actors such as those in this case must make a large number of decisions in charged atmospheres thereby inviting litigation against themselves in which plaintiffs ask the courts to second guess the actors' decisions.

Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267–68 (3d Cir. 2007) (footnote omitted).  This means that to prove the elements of a retaliation claim, the plaintiff must come forward with more than "general attacks" upon the defendant's motivations and must produce "affirmative evidence" of retaliation from which a jury could find that the plaintiff had carried his burden of proving the requisite motive.  Crawford–El v. Britton, 523 U.S. 574, 600 (1998) (internal citations omitted).  Courts have tended to view prisoners' retaliation claims with sufficient skepticism to avoid becoming entangled in every disciplinary action taken against a prisoner.  Walker v. Campbell, No. Civ.A.09-282, 2011 WL 6153104, at *4 (W.D. Pa. Oct. 31, 2011) (citing Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996); Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir.1995); Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)).

Assuming for purposes of this Motion only that Plaintiff has satisfied both the protected activity element—*i.e.,* the filing of a sexual harassment charge against Ms. Snyder—and the adverse action element—*i.e.*, his detention in administrative custody and transfer to S.C.I. Greene[4]—Plaintiff fails to put forth sufficient evidence to create a genuine issue of material fact as to the causation element.  The facts show that Officers Dohman and Radle began their

---

[4]  Notably, Defendants dispute that Plaintiff has established that he suffered any adverse actions.  As this claim is dismissed on other grounds, the Court need not address this argument.

investigation of Plaintiff's relationship with Officer Ballard back in 2005.  Plaintiff filed his

grievance against Ms. Snyder on November 19, 2008.  (Def.'s Mot. Summ. J., Ex. Q.)

Approximately six weeks later, on December 31, 2008, Plaintiff was interviewed by Dohman and

Radle regarding his suspected relationship with Ballard and whether he was willing to participate

in their separate investigation into possibly illegal conduct by Ballard.  (Feliciano Dep. 34:1–15.)

Ultimately, in January 2009, Officers Radle and Dohman submitted an investigation report

regarding Plaintiff's and Officer Ballard's suspected fraternization.  (Defs.' Mot. Summ. J., Ex.

P.)  Both Dohman and Radle indicated that by the time they interviewed Plaintiff regarding the

investigation, they had already determined to have him transferred due to his involvement with

Officer Ballard, irrespective of whether he participated in any narcotics investigation against

Officer Ballard.  (Dohman Decl. ¶ 14; Radle Decl. ¶ 14.)  As Plaintiff was to be transferred, his

placement in administrative custody was simply a matter of course.  (Dohman Decl. ¶ 5; Radle

Decl. ¶ 5.)

 In the present case, Plaintiff's reliance on "the timing of these adverse actions" to create

"an inference of retaliatory motive" is misplaced.  (Pl.'s Resp. Opp'n Summ. J. 13).  More than

forty days passed between Plaintiff's filing of the sexual harassment charge against Snyder and

his interview by Officers Dohman and Ballard—a period of time that is far outside what the

Third Circuit has deemed "unduly suggestive.   Plaintiff has put forth no evidence of an

intervening period of antagonism in the period between his filing of the claim and the December

31, 2009 interview.  Moreover, Plaintiff offers no contrary evidence to either cast doubt upon the

substantial evidence presented by Defendants or establish a connection between his sexual

harassment complaint and the alleged adverse actions.   Given the Third Circuit's directives that

22

courts must be diligent in enforcing causation requirements, the Court cannot find that Plaintiff's claim of First Amendment retaliation can survive summary judgment review.  As such, this claim must be dismissed on its merits.

### 2.    Fifth Amendment Retaliation

Plaintiff also brings a Fifth Amendment retaliation claim.  The Court finds that this claim fails due to Plaintiff's inability to establish that he engaged in any protected conduct.

The Fifth Amendment privilege against self-incrimination provides that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.   The Fifth Amendment was made applicable to the states by the Fourteenth Amendment.  Cnty. Concrete Corp. v. Town of Roxbury, 442 F.3d 159, 164 (3d Cir. 2006).  As the Supreme Court has made clear, "this prohibition not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."  Minnesota v. Murphy, 465 U.S. 420, 426 (1984) (internal quotation and citation omitted).  To claim the privilege, a person must be "confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination."  United States v. Doe, 465 U.S. 605, 614, n.13 (1984) (quoting Marchetti v. United States, 390 U.S. 39, 53 (1968)).  "It is well established . . . that the Fifth Amendment privilege against self-incrimination is not self-executing and thus must be claimed when self-incrimination is threatened."  United States v. Frierson, 945 F.2d 650, 660 (3d Cir. 1991); Jackson v. Dohman, No. Civ.A.11–6890, 2013 WL 775598, at *2 (E.D. Pa. Mar. 1, 2013).  "This rule means that a person cannot ordinarily complain on Fifth Amendment privilege grounds to

the use of information supplied by him or her unless the privilege was asserted at the time the information was given." Frierson, 945 F.2d at 660.  Thus, where, in the course of an internal investigation, a prisoner, who is being interviewed by correctional officers, admits that he did not remain silent and instead answered questions, he cannot assert a Fifth Amendment retaliation claim.  Jackson, 2013 WL 775598, at *2 (dismissing claim of Fifth Amendment retaliation where plaintiff was asked to participate in internal investigation and threatened with transfer for failure to cooperate, but plaintiff never invoked Fifth Amendment right to remain silent).

When considering this claim in the course of Defendants' Rule 12(b)(6) Motion to Dismiss, the Court found that the allegations of the Complaint could be liberally construed to suggest Plaintiff's invocation of the Fifth Amendment since Plaintiff asserted that he "refused to cooperate" and would not answer questions about Ballard's purported drug activity.  (Id. ¶¶ 7, 9, 10, 11, 15, 17.)  Upon reconsideration of this cause of action under a Rule 56 summary judgment standard, however, the claim clearly fails.  Plaintiff admitted that Officers Dohman and Radle asked him questions about whether Officer Ballard was bringing in contraband and he responded that "[he] wasn't aware of no contraband being brought in by Officer Ballard." (Feliciano Dep. 34:16–20.)  In other words, he did not invoke any right to remain silent, but rather answered the questions in the negative.  See Jackson, 2013 WL 775598, at *2 (dismissing Fifth Amendment retaliation claim under identical circumstances).  He also alleges that the officers started throwing accusations at him and telling him to cooperate with their investigation of Officer Ballard.  (Feliciano Dep. 35:16–37:10.)  He asserts that his response was that he would not tell lies about Officer Ballard and what they were saying was not true, (Compl. ¶¶ 7, 9), again failing to invoke his Fifth Amendment rights either explicitly by citing his constitutional

24

privileges or implicitly by not responding to questions in any fashion.[5]  Plaintiff's "decision to answer questions eviscerates any Fifth Amendment basis for his retaliation claim."  Mearin v. Dohman, No. Civ.A.06-4859, 2013 WL 1187050, at *5 (E.D. Pa. Mar. 21, 2013), aff'd, 553 F. App'x 60 (3d Cir. 2013).  Absent some showing that Plaintiff claimed the protections of the Fifth Amendment in the face of the threat of self-incrimination,[6] this claim cannot survive.[7]

### 3.      Eighth Amendment Claim

Finally, Defendants allege that Plaintiff has failed to establish his Eighth Amendment

---

[5]  Plaintiff cites to Tice v. Johnson, 647 F.3d 87, 107 (4th Cir. 2011) as support for his position that he invoked his Fifth Amendment rights.  In Tice, however, the plaintiff expressly stated, "I have decided not to say anymore."  Id. at 107.  Plaintiff in this case, however, made no similar invocation of his rights.

[6]  Courts have recognized that "[p]rison officials may not constitutionally require an inmate *participate actively* in a sting operation against corrupt prison guards.  If inmates have a constitutional right not to be labeled a 'snitch,' plaintiff's refusal to become one by participating in an internal sting operation is certainly constitutionally protected activity."  Cooper v. Beard, No. Civ.A.06-171, 2006 WL 3208783, at *12 (E.D. Pa. Nov. 2, 2006) (emphasis added). Notably, however, mere refusal to cooperate in an internal investigation is not constitutionally protected conduct.  Walker v. Campbell, No. Civ.A.09-282, 2010 WL 2891488, at *7 (W.D. Pa. May 4, 2010).  The Walker court found that the prisoner had not engaged in constitutionally protected conduct by refusing to cooperate because "it cannot be said that the mere asking for an inmate's help in an internal investigation constitutes deliberate indifference such as to rise to the level of an Eighth Amendment violation." Id.
  In the present case, Plaintiff's allegations reveal that he was only asked to cooperate in an internal investigation, not to actively participate, thereby making this matter more akin to Walker.  Moreover, and more importantly, Plaintiff has alleged only First and Fifth Amendment retaliation claims, not an Eighth Amendment retaliation claim.  (See Feliciano Dep. 95:2–12 (admitting he was not bringing an Eighth Amendment retaliation claim).)  The primary basis for allowing such Eighth Amendment retaliation claims to proceed is that by participating in an internal investigation and being labeled a "snitch," an inmate may be placing his life in danger. At no point did Plaintiff in his case allege that he did not want to participate in any investigation for fear of the ramifications it could have on his safety in prison.

[7]  Defendants also challenge Plaintiff's ability to establish the adverse action and causation elements of this claim.  Because the Court is dismissing the claim on the first element of constitutionally protected activity, these other elements need not be discussed.

claim.  "The Eighth Amendment, in only three words, imposes the constitutional limitation upon punishments: they cannot be 'cruel and unusual.'"  Rhodes v. Chapman, 452 U.S. 337, 345 (1981).  To state a claim under the Eighth Amendment, an inmate must satisfy an objective element and a subjective element.  See Farmer v. Brennan, 511 U.S. 825, 834 (1994).  Prison officials have a duty under the Eighth Amendment to "take reasonable measures to guarantee the safety of the inmates."  Farmer, 511 U.S. at 832 (quoting Hudson v. Palmer, 468 U.S. 517, 526–27 (1984)).  Thus, to prevail on a failure to protect claim under 42 U.S.C. § 1983 against an individual, an inmate must show that he is "incarcerated under conditions posing a substantial risk of serious harm," and that the defendant was deliberately indifferent to the risk.  See Farmer, 511 U.S. at 833, 837.  To establish deliberate indifference, a plaintiff must show that the individual was subjectively aware of the risk of harm to the plaintiff's health or safety, and disregarded it.  Id.; Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003).

In the present case, Plaintiff has failed to enunciate a clear basis for his Eighth Amendment claim.  When asked at his deposition about this claim, the following exchange occurred:

Q. Okay.  Well, tell me about the Eighth Amendment claim in your Complaint, because that's what we have to—that's what I have to address.  That's what you have to address.  That's what you have to prove at this point.

A. Right.  The cruel—.

Q. So how did they violate your Eighth Amendment?

A. The cruel and unusual punishment that I was inflicted with.  Is that what you're talking about?

Q. Yeah.  Now, you have to go into more detail.  What did they do that was cruel and unusual punishment?

A. They were all aware of what was going on and did not act on it.  They were in an official, supervisory capacity and could have told them, look, hold up.  What's going on here.  Let me see what you got.  Get involved and take it for what it was worth.  If it was true, then it was true.  If it was a lie, then stop

26

them from doing it.  But they didn't.  They didn't act—

Q.     That's not—

A.     I mean other than what I have, I mean what can I give you?  They were in a supervisor capacity.

Q.     That's not–

A.     They was responsible.

Q.     That's not an Eighth Amendment claim.  That's not cruel and unusual punishment.  I asked you to produce your—you're restating supervisor liability for the retaliation claims.  That's what you were talking about.  The Eighth Amendment claim is they beat you up, they starved you for a month and they didn't let you see the doctor.  That's what we're talking about with the Eighth Amendment.  Do you make a claim like that?

A.     No.  I think it was just based on the claim with my access to the courts claim.  It was tied to the—

Q.     Okay.

A.     —access to the courts claim.

(Feliciano Dep. 95:13–96:24.)  In light of such testimony, it is clear that Plaintiff alleges no Eighth Amendment claim against Defendants.  Indeed, he makes no effort to defend it in his Response to Defendants' Motion for Summary Judgment.[8]  Accordingly, the Court dismisses this claim on its merits.

## IV.    CONCLUSION

In sum, Defendants are entitled to summary judgment on the entirety of Plaintiff's Complaint for several reasons.  First, even given the benefit of tolling during the pendency of Plaintiff's administrative grievances, Plaintiff's claims are clearly time-barred.  Second, assuming the claims were filed in a timely fashion, Plaintiff has (1) failed to establish a genuine issue of material fact as to causation with respect to his First Amendment retaliation claim; (2)

---

[8]  Even if Plaintiff were to bring an Eighth Amendment claim, it is not clear that he could succeed.  The Third Circuit has held that "absent an allegation of physical harm, the defendant's verbal threats do not amount to a constitutional violation.  Booth v. King, 228 F. App'x 167, 172 (3d Cir. 2007).  Thus, to the extent Plaintiff would base an Eighth Amendment violation solely on the threats by Dohman and Radle, such threats could not sustain a claim.  Jackson, 2013 WL 775598, at *2–3.

failed to establish a genuine issue of material fact as to whether he engaged in protected conduct with respect to his Fifth Amendment retaliation claim; and (3) failed to set forth any substantive basis for his Eighth Amendment claim.  Accordingly, the Court dismisses all of these claims and grants Defendant's Motion for Summary Judgment.[9]

---

[9] Defendants raise multiple other arguments in support of their Motion for Summary Judgment, including failure to exhaust, lack of personal involvement, and qualified immunity. Having already found both procedural and substantive grounds on which Plaintiff's claims fail, the Court need not address Defendants' other arguments.  The absence of discussion of these arguments, however, does not reflect the Court's opinion as to the merits of those arguments.